NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0301n.06

No. 25-3672

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 13, 2026
KELLY L. STEPHENS, Clerk

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

GIANNI GRAY,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: BOGGS, KETHLEDGE, and THAPAR, Circuit Judges.

BOGGS, Circuit Judge. Police observed three firearms while executing an arrest warrant for Gianni Gray in his house. They seized the first two guns immediately, but left the third in place until investigators returned later that day with a search warrant. Everyone agrees that the initial search violated the Fourth Amendment because the arrest warrant was supported only by a bare-bones affidavit. Our court previously suppressed the first two guns and remanded to the district court for consideration of whether the third gun could be admitted under the independent-source doctrine. Because investigators would have sought and obtained the search warrant even if the arrest had never occurred, we affirm the district court's denial of Gray's renewed suppression motion.

**I**

**A**

This appeal concerns a felon-in-possession conviction, but the events giving rise to this federal prosecution involve far graver crimes. On July 14, 2018, police responded to reports of a double homicide at the intersection of Interstate 90 and West 117th Street in Cleveland, Ohio.

Two victims, Andre Demetrius Williams, Jr., and Malachi P. Stewart, were found dead inside a blue Chevrolet Cobalt. Investigators quickly identified Gianni Gray as a suspect. Three days after the shooting, Detective Christina Cottom of the Cleveland Division of Police (CDP) applied for an arrest warrant in state court. Her supporting affidavit stated in full: "On Saturday July 14th, 2018 at approximately 1924 hours at the location of W. 117th and I-90 West Bound exit ramp, Gianni Gray did shoot and kill Malachia [sic] Stewart and Andre Williams while they sat in a car." R. 22-2, PageID 77. A deputy clerk of the Cleveland Municipal Court found probable cause and issued the arrest warrant.

An anonymous tipster and a police report from a prior domestic-violence incident indicated that Gray lived at 11016 Penfield Avenue in Garfield Heights at the time of the shooting. But the police could not find him. Despite repeated efforts to apprehend him, Gray eluded capture for nearly two years.

Finally, in April 2020, the Northern Ohio Violent Fugitive Task Force ("Task Force") received intelligence that Gray was living at 12113 Union Avenue in nearby Cleveland. The Task Force corroborated the tip by surveilling the Union Avenue address and researching its property records. While watching the house over several days, officers observed a man matching Gray's description and two women, including Wanda Buriguette-Downs, with whom Gray had had children. Officers also learned that an LLC that listed Gray (using a known alias) as its registered agent purchased the house in 2019 from Buriguette-Downs.

On the morning of May 5, CDP Sergeant Keith Haven was surveilling the house for the Task Force. He watched as someone inside the house opened the front door for an unknown man, who was smaller than Gray. "[S]trongly suspect[ing]" that Gray was living at the house, the Task Force decided to execute the arrest warrant. R. 129, PageID 819. They assembled a team, knocked

and announced their presence, and—after waiting for 20 minutes without any response—breached the door. Once inside, the Task Force deployed a robot to search room by room for occupants, with officers following closely behind.

Sergeant Haven proceeded upstairs and observed two guns in plain view. Concerned that an occupant "could come back and obtain these firearms and use them against" the Task Force, Sergeant Haven seized the guns, and a fellow officer removed them from the building. *Id.* at 824. Sergeant Haven then heard "someone call out that they wanted to give up." *Ibid.* Looking through a hole in the floor, Sergeant Haven observed the unknown man who had entered the house that morning emerging from a hiding spot with his hands in the air. A few moments later, Gray appeared and surrendered too.

Both men were taken into custody, but the Task Force worried that other occupants and firearms might have remained in the house. To guard against an ambush, officers conducted a protective sweep of the rest of the house. They noticed a third gun in plain view in the basement, but left it untouched and stationed an officer to secure the area.

Sergeant Haven notified Detective Cottom about the arrests and discoveries of firearms. Detective Cottom prepared an application for a search warrant to "obtain any firearms in the [Union Avenue] premises as well as any clothing, narcotics or electronic devices which may be relevant to this investigation." R. 108-1, PageID 698. Detective Cottom drafted a new affidavit to support her search-warrant application, including much more detail this time.

The affidavit first recounted the evidence from 2018 that connected Gray to the double homicide. On July 14, the day of the shooting, Detective Cottom interviewed an eyewitness who observed the shooter firing from an Audi Q-5. Surveillance footage from a nearby business confirmed the eyewitness's account and showed that the car was "silver/gray." *Id.* at 696. The day

after the shooting, an anonymous tipster reported Gray as the culprit and said that police would find an Audi parked in the driveway of Gray's then-residence on Penfield Avenue. Sure enough, a police officer who drove by the Penfield Avenue address "observed a gray Audi parked in the drive with a garbage can in front of the license plate as if to conceal the license plate." *Ibid.* The officer could nevertheless read the plate and run it through a law-enforcement database, which traced the car's registration to a local Audi dealership. The same day, a different officer interviewed the sister of Stewart, one of the murder victims, who shared that Stewart had warned her that Gray had threatened to kill him in retaliation for the death of Gray's brother. Anonymous tips corroborated that motive, and prior CDP records listed Stewart as a suspect in the homicide of Gray's brother. Capping the inculpatory evidence, the affidavit noted that officers recovered the Q-5 after Gray returned it to the dealership and discovered Stewart's blood inside.

Detective Cottom's affidavit next explained the evidence connecting Gray to 12113 Union Avenue. She disclosed the April 2020 tip that Gray was living with Buriguette-Downs on Union Avenue. The informant advised that Buriguette-Downs was known as "Star," had one child with Gray already, and was pregnant with a second. Detective Cottom researched Buriguette-Downs on social media and located her account, which used the nickname "Star Bourne," listed a son named "Gray," and indicated that she was pregnant. *Id.* at 697. Detective Cottom also wrote that Buriguette-Downs had sold the Union Avenue property in 2019 to Gray's LLC, yet that property still appeared as Buriguette-Downs's address in Ohio's motor-vehicle records.

In Paragraph 18, the affidavit reported that the Task Force had arrested Gray at the Union Avenue property and observed three guns inside. Other than this statement, Detective Cottom did not explain why she believed that officers would recover guns at that address. A Cuyahoga County

Court of Common Pleas judge issued the search warrant on May 5, 2020, and officers seized the third gun later that day.

B

Gray was indicted in Ohio state court and eventually convicted of two counts of aggravated murder, along with various lesser offenses. *State v. Gray*, 206 N.E.3d 842, 845 (Ohio Ct. App. 2023). He received a sentence of 84 years to life in prison, with the possibility of parole after 70 years. *Ibid.* He did not challenge the Union Avenue searches in his state-court appeal.

Separately, on August 13, 2020, a federal grand jury sitting in the Northern District of Ohio returned a single-count indictment charging Gray with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). The indictment referenced all three firearms seized at 12113 Union Street. Gray moved to suppress the three guns, arguing in part that they were fruits of an invalid arrest warrant based on a "bare bones" affidavit. R. 22, PageID 67–69. The district court denied his motion. Gray subsequently entered into a plea agreement, which contemplated that a sentencing enhancement would apply for possessing three firearms. His plea agreement preserved his right to appeal the district court's denial of his suppression motion. The district court accepted Gray's guilty plea, applied the sentencing enhancement, and sentenced him to 63 months of imprisonment, to be served concurrently with his undischarged state sentence.

Gray appealed his federal conviction, renewing his argument that the police unlawfully seized the three firearms. The government confessed error with respect to the two guns found upstairs and seized before Gray's arrest, acknowledging that those seizures were the product of a bare-bones affidavit. On the government's motion, and without opposition from Gray, we vacated the district court's judgment and remanded with instructions to (1) suppress the two firearms seized

upstairs and (2) conduct further proceedings regarding the third gun found in the basement. *United States v. Gray*, No. 22-3883, 2024 WL 1513757, at *1 (6th Cir. Apr. 5, 2024) (order).

On remand, the district court conducted a second suppression hearing. Much attention focused on the influence of fruits of the (unlawful) arrest warrant on the police's decision to request a search warrant. Sergeant Haven and Detective Cottom recounted the searches on May 5, 2020, and explained the coordination between the Task Force and homicide detectives.

Both officers indicated that the plan all along was to seek a search warrant, regardless of the results of the execution of the arrest warrant. Sergeant Haven testified that he "already had knowledge" that homicide investigators "would obtain a search warrant in the location where [Gray] was found and arrested." R. 129, PageID 845. Detective Cottom went further, explaining that she would have requested a search warrant even if the Task Force had not found Gray in the Union Avenue residence that morning. Her knowledge about Gray's connections to the property and Buriguette-Downs, who herself had an outstanding arrest warrant, prompted her interest in searching the residence. Detective Cottom acknowledged that she included the discoveries of Gray and the three guns at the property in her search-warrant affidavit, but she believed that she would have had probable cause even without that evidence (despite giving arguably contrary testimony on cross-examination).

The district court denied Gray's renewed suppression motion, finding that the independent-source doctrine allowed the third gun into evidence. Gray again entered into a plea agreement and preserved his right to appeal the district court's suppression ruling. The district court accepted Gray's plea and resentenced him to 51 months of imprisonment (as before, concurrent with his state sentence), a 12-month reduction from his original federal sentence because the three-gun sentencing enhancement no longer applied. This timely appeal followed.

## II

Our limited task is to decide whether to suppress the third gun. While one might expect that the admissibility of all three guns should rise or fall together, recall that the third gun was observed during the execution of the arrest warrant, but (unlike the first two) was not seized until investigators arrived with the search warrant. The question becomes whether the search warrant independently supports the third gun's admissibility. The district court answered yes. We review the district court's factual findings for clear error and its legal conclusions de novo, *United States v. Lester*, 98 F.4th 768, 773 (6th Cir. 2024), and we affirm.

As a general matter, the exclusionary rule requires the suppression of evidence obtained in violation of the Fourth Amendment. *Murray v. United States*, 487 U.S. 533, 536–37 (1988). But for almost as long as the Supreme Court has recognized the exclusionary rule, it has also developed "what has come to be known as the 'independent source' doctrine." *Id.* at 537 (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920)). This doctrine seeks to put "the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." *Ibid.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).

If the government establishes two conditions, the independent-source doctrine allows the admission of evidence obtained through a search warrant despite the warrant application including fruits from an earlier, unlawful search. *See United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022). First, the police's "decision to seek the warrant" must not have been "prompted by what they had seen during the initial entry." *Murray*, 487 U.S. at 542. Second, the information obtained during the initial entry must not have "affected" the magistrate's "decision to issue the warrant." *Ibid.* The latter component asks not whether the illegally obtained information carried some abstract persuasive effect, but rather whether that information altered the magistrate's ultimate

decision of whether to issue the warrant. *United States v. Jenkins*, 396 F.3d 751, 757–58, 760 (6th Cir. 2005). In other words, we ask "if probable cause exists without the tainted information." *Id.* at 760.

Starting with the first component, we evaluate the officers' suppression-hearing testimony and the context of the investigation to ask whether they would have sought a search warrant even without the benefit of knowing what the illegal initial search revealed. *See Lester*, 98 F.4th at 776 (citing *Murray*, 487 U.S. at 540 n.2). Undoubtedly, the initial search confirmed two important facts: that Gray indeed used the house and that the house contained firearms. But Detective Cottom, the lead investigator, explained that she would have requested a search warrant regardless of these two findings. Sergeant Haven testified similarly.

Granted, Detective Cottom had previously given an arguably contradictory answer to Gray's counsel during cross-examination. But the facts surrounding the investigation lend credence to her clarification on re-direct that Gray's arrest did not influence her strategy. Consider that Detective Cottom had yet to apprehend Gray or recover the murder weapon despite searching for nearly two years. Then, on the morning of May 5, 2020, she learned of a tip, surveillance, and record evidence connecting Gray to the Union Avenue residence. She also had reason to believe that Buriguette-Downs would likely have been at the property and possess information about Gray's whereabouts, even if Gray himself was not there. Most investigators would have pursued these leads, so Detective Cottom's testimony that she would have sought the search warrant even without knowing who and what the Task Force had seen at the house was not "implausible." *Murray*, 487 U.S. at 540 n.2.

Resisting this conclusion, Gray invokes our unpublished decision in *United States v. Williams*, 656 F. App'x 751 (6th Cir. 2016). In *Williams*, the police conducted a (lawful) search at

one drug house and found keys that they suspected would open the door to a second drug house. *Id.* at 752. Police had previously gathered evidence connecting the suspects to both addresses. *Ibid.* Officers traveled to the second house and, before obtaining a warrant, opened the front door with one of the keys. *Ibid.* Even though the officers would later testify that they would have sought a search warrant for the second house even had the key not unlocked the door, the district court found this post-hoc rationalization implausible and suppressed the fruits from the second house. *Id.* at 753–54. We declined to find clear error in the district court's analysis of the record. *Id.* at 755.

*Williams* does not bind us, and we question its reasoning. After all, the fact that officers had already gathered extensive evidence of the defendants' criminal activity at the second house seems to support their later testimony that they would have wanted to search that house regardless of whether the key opened the door. *See id.* at 752 (noting that surveillance completed prior to any searches "revealed that Williams and Gulley visited the [second] house, that the frequency, length, and duration of these visits were identical to prior visits to other suspected stash houses, that Williams and Gulley both had keys to open the front door of the residence, that no one appeared to be living in the house, and that a Pontiac Montana—a vehicle suspected of trafficking drugs for the organization—had regularly visited the residence"). An off-site officer "was already in the process of preparing a warrant affidavit" before the on-site officers tried the key. *Ibid.* We question whether the police really would have lost interest in investigating the second house had they not had the key to open it.

But regardless of our doubts about *Williams*, the district court here drew the opposite conclusion from the district court in that case. The district court here believed the officers' testimony that they would have sought a search warrant even had the entry pursuant to the arrest

warrant not uncovered Gray and the three guns. The district court did not clearly err by crediting this testimony in light of the investigation's recent developments tying Gray to the Union Avenue house. The illegal initial search at Union Avenue did not prompt the police's effort to procure the subsequent search warrant.

We next consider whether the magistrate would have had probable cause to issue the search warrant even without knowing what the initial search revealed. Unlike the preceding analysis of whether the police would have *wanted* to search the house, which permits consideration of testimonial evidence, this analysis of whether the police would have been *authorized* to search the house "is concerned only with the statements contained within the affidavit." *Jenkins*, 396 F.3d at 760. Paragraph 18 of Detective Cottom's affidavit recited Gray's arrest and officers' observations of firearms at 12113 Union Avenue, so "we must remove [that paragraph] from the affidavit when considering whether there is still sufficient information to establish probable cause to search" the residence. *United States v. Davis*, 430 F.3d 345, 357–58 (6th Cir. 2005).

Probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This standard does not set a high bar, but it does require a nexus between the evidence of a crime and the place to be searched. *United States v. Sanders*, 106 F.4th 455, 461–63 (6th Cir. 2024) (en banc). Stripping the affidavit of Paragraph 18 does nothing to undermine the probable cause that Gray committed the double murder on July 14, 2018, and lived at 12113 Union Avenue on May 5, 2020. The affidavit established a nexus between Gray and the crime: it recounts eyewitness statements, surveillance footage, corroborated tips, police interviews, law-enforcement records, and forensic analysis that collectively placed Stewart's blood in Gray's car and identified a motive. The affidavit likewise connected Gray to 12113 Union Avenue: it explained how the police

corroborated several details supporting an informant's recent tip that Gray had moved there with Buriguette-Downs. *See Alabama v. White*, 496 U.S. 325, 331 (1990) (recognizing that if "an informant is shown to be right about some things, he is probably right about other facts that he has alleged").

A more difficult question, however, concerns whether the affidavit also established a nexus between evidence of Gray's two-year-old crime and his new residence. Deleting Paragraph 18 expunges all of the direct evidence connecting Gray's criminal conduct to 12113 Union Avenue. But the absence of such direct evidence is not necessarily fatal, and it is not so here.

A "magistrate may *infer* a nexus between a suspect and his residence, depending upon 'the type of crime being investigated, the nature of [the] things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places.'" *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008) (emphasis added) (quoting *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985)). Applying this rule, we found a sufficient nexus connecting two handguns to a suspect's residence where an officer's affidavit contained facts alleging merely that the suspect lived at that address, possessed two handguns, and had committed several recent offenses involving firearms. *Id.* at 685. Even without any evidence directly tying the guns to the suspect's house, we agreed with the government that "it is reasonable to suppose that some criminals store evidence of their crimes in their homes, even though no criminal activity or contraband is observed there." *Id.* at 686–87 (citation modified). Similarly, relying on a long line of gun-search cases demonstrating that the requirement of an evidence-residence nexus "is not as onerous as it may appear," we upheld a warrant to search for computers at a suspect's residence based solely on "the averment that he used one in the commission of a

crime." *Peffer v. Stephens*, 880 F.3d 256, 270, 273 (6th Cir. 2018). When searching for a gun,[1] an affidavit that establishes probable cause that the suspect has used a gun to commit a crime permits a magistrate to "presume that there is a nexus between that object and the suspect's current residence, unless the affidavit contains facts that may rebut that presumption." *Id.* at 270–71.

An additional complication arises because two years had passed, and Gray had moved, between the commission of the crime and the request for the search warrant. The presumptive nexus between a suspect's gun and his residence "is subject to a staleness analysis." *Id.* at 271 n.10. When time has elapsed between the crime and the search, the suspect may have stored his gun elsewhere or disposed of it altogether. *Id.* at 270. In considering whether the nexus between the murder weapon and Gray's residence had expired, we account for "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?)," and other variables. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).

Although some of these factors may weigh in Gray's favor, ultimately the nature of the crime and Gray's connections to the residence supported a fair inference that officers would find firearms at 12113 Union Avenue. On the one hand, the crime alleged arose from an isolated incident, and Gray had moved in the interim. But on the other hand, he had enduring utility for his firearms. A magistrate could reasonably infer that Gray was eluding law enforcement and had

---

[1] Of course, an inferential nexus between evidence and a suspect's residence is less justifiable in certain cases, especially those involving drug trafficking. *See Peffer*, 880 F.3d at 272–73. This distinction lies in a commonsense observation that "unlike guns and computers that are used in the commission of a crime, when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor." *Id.* at 273; *see also Sanders*, 106 F.4th at 461–66 (summarizing the many context-dependent ways in which the police can establish a nexus between evidence and the suspect's residence, as well as the specific problems that arise in drug cases). The sole case Gray invokes to question the nexus to his residence comes from the drug-trafficking context, so it carries little weight here. *See United States v. McPhearson*, 469 F.3d 518, 524–25 (6th Cir. 2006).

contributed to a pattern of retaliatory killings. And the Union Avenue address represented a secure base rather than temporary shelter. After all, police confirmed a tip that the mother of Gray's child lived there, and that same tipster advised that Gray himself resided there too. Moreover, a magistrate could reasonably infer that Gray had deeper connections to the Union Street address, given that Buriguette-Downs sold the property in 2019 to an LLC registered in the name of Gray's alias. Perhaps most importantly, although the affidavit presented no evidence of Gray using a firearm since July 2018, a two-year-old observational gap is not stale "given that firearms are not perishable items." *United States v. Lancaster*, 145 F. App'x 508, 513 (6th Cir. 2005); *see also United States v. Vanderweele*, 545 F. App'x 465, 469–70 (6th Cir. 2013). All told, neither the passage of time nor Gray's single, local move rebuts the presumption of a nexus between the murder weapon and Gray's residence.

Stripped of the fruits of the invalid arrest warrant, the search-warrant affidavit still presented probable cause to believe that Gray killed Stewart and Williams with a gun, that Gray lived at 12113 Union Avenue, and that guns and other evidence of those homicides would be found at that address. In a substantive sense, then, Paragraph 18 did not affect the magistrate's decision because an untainted affidavit would still have presented probable cause. *See Jenkins*, 396 F.3d at 760. The search warrant provided an independent source for the discovery of the third gun, so the district court correctly declined to suppress it from evidence.

**III**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.